UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
LEONARD SEMERARO,

                        Plaintiff,        Docket No. 1:17-cv-8535-ER

       -against-               AFFIDAVIT IN SUPPORT OF MOTION
                                                          TO DISMISS AMENDED COMPLAINT
THE WOODNER COMPANY and JEFF
BURDICK,

                        Defendants.
-------------------------------------------------------X

STATE OF NEW YORK      )
                                   ) ss.:
COUNTY OF WESTCHESTER  )

JEFFREY BURDICK, being duly sworn, hereby deposes and says:

(1)    At all times pertinent hereto, I have been employed by Defendant Woodner Company ("Woodner" or the "Company") as General Manager of the premises known as Crestwood Lake Apartments ("premises" or "property") located in Yonkers, New York and am a named Defendant in the above-captioned lawsuit. In addition to other responsibilities, I served as the direct supervisor of Plaintiff Leonard Semeraro. In that capacity, I am fully and personally familiar with all the facts and circumstances set forth herein.

(2)    This Affidavit is respectfully submitted in support of Defendants' Motion to dismiss Plaintiff's "Amended Verified Complaint" pursuant to § 12(b)(6) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.").

## THE PARTIES

(3)    Crestwood Lake Apartments is the largest apartment development in Westchester County. It consists of 1,100 units in 66 buildings located on 55 acres.

1

(4) Besides myself, the property employs 26 workers, comprising supervisors, porters, handymen, plumbers, painters and groundsmen. In addition, 3 rental agents and office employees are employed at the premises.

(5) The wages, hours and other terms and conditions of the janitorial and maintenance staff are governed by a collective bargaining agreement ("CBA") between Woodner and Service Employees International Union Local 32BJ ("Local 32BJ" or the "Union").

(6) At all times pertinent hereto, Scott Kessler has been Woodner's Chief Executive Officer.

(7) At all times pertinent hereto, I have served in the executive capacity of General Manager of the premises.

(8) At all times pertinent hereto, Plaintiff Leonard Semeraro was employed by Woodner as the Superintendent of the janitorial and maintenance staff, the highest-ranking non-executive employee at the premises.

## BACKGROUND

(9) Although the Company continually invests in the maintenance and upkeep of the property, starting in 2015, Woodner made major capital investments in upgrading and renovating the property. The Company invested millions of dollars on major capital improvements such as installing new roofs on buildings, re-engineering trash removal systems, replacing seventeen (17) antiquated playgrounds and undertaking a massive re-landscaping of the property to improve aesthetics and increase property value.

(10) Because of the huge expenditure of funds, the Company's ownership, together with the Company's Chief Executive Officer, Scott Kessler, and I increased our scrutiny of the property and conducted inspections.

(11)    These inspections revealed a shocking state of disrepair that threated to undo all of the improvements that the Company was attempting to make.

(12)    Among the most serious of the literally hundreds of problems observed were:

- Flooded and unusable basement laundry rooms;
- Flooded crawlspaces;
- Crumbling building facades;
- Cracked and crumbling sidewalks and curbs;
- Broken windows in common areas;
- Broken light fixtures in exterior lampposts
- Broken storm drain catch basins;
- Broken concrete stoops;
- Broken radiators;
- Broken and missing vents and vent covers;
- Missing slats in outdoor benches;
- Graffiti; and
- Very poor standards of cleaning and maintenance.

(This list is intended to be illustrative of the most serious deficiencies, not exhaustive.)

(13)    Not only were many of these conditions unsightly, many were outright dangerous, creating the likelihood of liability for the Company.

(14)    When these problems came to light, the Company issued written instructions to Mr. Semeraro directing him to make a list of all conditions that required remediation.

(15)    Mr. Semeraro created the list as directed. However, the list contained only a small fraction of the conditions that had already been observed and was, therefore, unsatisfactory.

3

(16)  For that reason, it was decided to re-structure the supervision at the property, re-allocate Mr. Semeraro's responsibilities to several other supervisors, and to eliminate his position as redundant.

(17)  Accordingly, Mr. Semeraro's employment was terminated effective July 28, 2017.

(18)  At no point in time did Mr. Semeraro complain of the presence of asbestos on the premises or threaten to report this to any governmental authorities.

(19)  I am personally unaware if Mr. Semeraro ever complained to the U.S. Occupational Safety and Health Administration ("OSHA") or any other government agency prior to his termination.

## THE LITIGATION

(20)  Following Mr. Semeraro's termination, he filed a grievance with Local 32BJ alleging that the termination violated the "just cause" requirement for discharge or discipline contained in the CBA.

(21)  To the best of my knowledge, the grievance is still pending although no grievance meetings or arbitration has taken place.

(22)  On or about October 17, 2017, Mr. Semeraro filed a Verified Complaint in the Supreme Court of the State of New York, County of New York sub nom. *Leonard Semeraro v. Woodner Company and Jeff Burdick*, Index No. 656422/2017.

(23)  The Verified Complaint alleges five (5) causes of action:

    (a)  "work environment harassment,"

    (b)  retaliatory discharge in violation of New York State's "whistleblower statue" (Labor Law § 740),

    (c)  age discrimination in violation of New York State's Human Rights Law (Executive Law § 296),

4

  (d) age discrimination in violation of the federal Age Discrimination in Employment Act (29 U.S.C. § 621 *et seq.*), and

  (e) breach of the collective bargaining agreement.

(24) Because the Verified Complaint contained a cause of action predicated upon a federal statute which vested original jurisdiction in the federal courts, Defendants removed the action from the Supreme Court of the State of New York, County of New York to the United States District Court for the Southern District of New York on November 3, 2017 (Doc. No. 1).

(25) On November 16, 2017, Defendants' counsel wrote to the Court seeking a pre-motion conference in anticipation of making a Motion to Dismiss Plaintiff's Verified Complaint for failure to state a claim pursuant to Fed.R.Civ.P. Rule 12(b)(6) (DOC. NO. 5).

(26) The Court held a pre-motion conference on December 5, 2017 at which both sides appeared. Plaintiff was given leave to amend his Complaint if he so desired. If no such amendment was desired, the Court set a briefing schedule for Defendants' Motion to Dismiss (Minute Entry 12/05/17).

(27) The Plaintiff filed a pleading styled "Amended Verified Complaint" on December 19, 2017 (DOC. NO. 11).[1]

(28) The First Amended Complaint alleges four (4) causes of action:

  (a) retaliatory discharge in violation of New York State's "whistleblower statue" (Labor Law § 740(a)(2)),

  (b) age discrimination in violation of New York State's Human Rights Law (Executive Law § 296),

---

[1] This document is referred to in the Docket as Plaintiff's "First Amended Complaint" (DOC. NO. 14).

(c) age discrimination in violation of the federal Age Discrimination in Employment Act (29 U.S.C. § 621 *et seq.*), and

(d) breach of the collective bargaining agreement.

(29) Because the four (4) causes of action contained in the First Amended Complaint were identical to their counterparts in the original "Verified Complaint," Defendants sought, and received, leave to file a Motion to Dismiss the First Amended Complaint (DOC. NO. 14).

THE INDIVIDUAL CLAIMS

(30) Each cause of action contained in the Plaintiff's First Amended Complaint must be dismissed for failure to state a claim. These will be discussed *seriatim*.

A. The "Whistleblower Retaliation" Claim

(31) I am informed by counsel that, in order to state a valid claim of "Whistleblower Retaliation" under NYLL § 740(a)(2), a plaintiff must "plead and prove" that the employer took retaliatory action against an employee who discloses or threatens to disclose to a supervisor or public authority that the employer engaged in an activity, policy or practice that constituted an <u>actual violation</u> of law, rule or regulation which presented a substantial and specific danger to the health and safety of the public at large.

(32) I am further informed by counsel that an employee who reports or threatens to report an activity, policy or practice that is either not an actual violation of law, rule or regulation or does not present a substantial and specific danger to the health and safety of the public at large does so at his own risk.

(33) In the case at hand, the allegations contained in Plaintiff's First Amended Complaint fail to plead the necessary elements.

(34) Plaintiff has failed to establish that Defendants actually violated a law, rule or regulation.

(35) The mere presence of asbestos on the property does <u>not</u> violate any law rule or regulation.

(36) Plaintiff cites Part 56 of Title 12 of the Official Compilation of Codes, Rules and Regulations of the State of New York (cited as 12 NYCRR Part 56) as support for his conclusory statement that the mere presence of asbestos on the premises was unlawful.

(37) Plaintiff's reliance upon 12 NYCRR Part 56 is misplaced; it only regulates education, training, certification, licensing and procedures to be followed when work is performed upon asbestos. Section 56-1.2 provides in pertinent part:

> It is the purpose and intent of this Part to reduce the risks to the public associated with risks of exposure to asbestos and to conform to Federal requirements set forth in the Asbestos Hazard Emergency Response Act (AHERA),[2] National Emissions Standards for Hazardous Air Pollutants (NESHAP)[3] and Occupational Safety and Health Administration (OSHA) Asbestos Standard for the Construction Industry, by requiring appropriate training and certification of persons employed in all aspects of an asbestos project, as well as those who supervise and employ them; by requiring the licensing of asbestos contractors; by setting forth standards and procedures that shall be followed when removing, enclosing, encapsulating, repairing or disturbing friable or non-friable asbestos or handling asbestos or asbestos materials in a manner which may result in the release of asbestos fiber; by requiring notification of the Department of Labor prior to the commencement of large asbestos projects; by requiring notice of building/structure occupants; by requiring asbestos surveys; by setting forth record-keeping and reporting requirements for asbestos contractors; and by establishing an inspection and enforcement program within the Department of Labor.

(38) Therefore, it can be plainly seen that Plaintiff's allegations that Defendants violated a law, rule or regulation are unsupported and conclusory.

(39) Similarly, Plaintiff's allegations that Defendants' conduct presented a specific and substantial risk to the health and safety of the public at large are unsupported and conclusory.

(40) Finally, Plaintiff's claims of retaliation are also speculative and conclusory.

---

[2] This legislation deals with asbestos in schools.
[3] These standards, established by the Environmental Protection Agency (EPA), govern procedures to be used in handling asbestos and is the federal analog to 12 NYCRR Part 56.

(41)   Plaintiff alleges that Defendants retaliated against him for his numerous reports about the presence of asbestos in garages belonging to compound residents (DOC. NO. 11, ¶ 16).

(42)   Plaintiff, however, fails to establish the required link between his conduct and the Defendants' actions, thereby failing to create an inference of causality.

(43)   Plaintiff further alleges that, after reports of the presence of asbestos reached OSHA, Defendants intensified harassing him (DOC. NO. 11, ¶ 16).

(44)   It must be respectfully noted, however, that Plaintiff, by his own admission, did not file a complaint with OSHA concerning the presence of asbestos until September, 2017 (DOC. NO. 11, ¶ 17). This was well over a month after Plaintiff was terminated.

(45)   Plaintiff's own pleadings conclusively demonstrate that there was no retaliation in this case.

(46)   OSHA has visited the property no less than three (3) times in the past twelve (12) months and conducted inspections in my presence of areas containing asbestos.

(47)   OSHA has issued no violations concerned the presence of asbestos at the property.

(48)   For the reasons set forth above, I am informed by counsel that Plaintiff's claim that he suffered unlawful retaliation as a result of whistleblower activities is fatally deficient as a matter of law and must be dismissed.

      B.    <u>Age Discrimination in Violation of New York State's Human Rights Law</u>

(49)   Plaintiff alleges that he "was deliberately targeted by Defendant Burdick for his age. Defendants allegedly passed Plaintiff up for promotion in favor of another staff member because, as Defendant Burdick allegedly stated, 'he was younger and college educated,'" created a "hostile work environment" (DOC. NO. 11, ¶¶ 20, 31).

(50) Plaintiff further alleges that he was "subjected to adverse employment action in the form of harassment, passing up for promotion and finally termination because of his advanced age" (DOC. NO. 11, ¶ 32).

(51) With respect to Plaintiff's claims of harassment on account of age, he alleges that Defendants "unreasonably interfered with Plaintiff's work performance and creating intimidating, hostile, or offensive working environment. In doing so, both Defendants acted with the requisite purpose of forcing Plaintiff to quit his job. The Plaintiff's workplace was "permeated with discriminatory intimidation, ridicule and insult that were sufficiently severe and pervasive to alter the conditions of Plaintiff's employment" (DOC. NO. 11, ¶ 31).

(52) I am advised by counsel that the afore-mentioned allegations are a "threadbare" recital of the elements of a cause of action for discrimination and are insufficient as a matter of law.

(53) Plaintiff's claims are all conclusions, <u>unadorned by a single fact</u>! His pleadings say <u>nothing</u> about what was done to him, who did it and when it was done. There is literally not enough in the First Amended Complaint to put Defendants on notice of what they stand accused or to formulate a response.

(54) Plaintiff's claim that he was denied a "promotion" because of age is equally devoid of facts or logic.

(55) At all times pertinent hereto, Plaintiff was the highest-ranking non-executive employee at the property. He was in charge of the staff. There was nowhere to promote him to and nobody was promoted over him.

(56) At the time of Plaintiff's termination, the supervisors were:

    (a) Leonard Semeraro, Superintendent, total annual compensation $98,532.72;

(b)   Manny Marrero, Assistant Superintendent, total annual compensation $62,318.75;

(c)   Morris Douge, Lead Landscape Gardener, total annual compensation $62,400.00.

(57)   As the above facts plainly demonstrate, Plaintiff was already the highest-ranking and, by far, the highest-paid employee at the property with the sole exception of myself. As previously stated, I am the General Manager of the property and am considered an executive employee.

(58)   Plaintiff's pleadings totally fail to state who was promoted, when that person was promoted or what position was involved.

(59)   Finally, with respect to termination, Plaintiff only alleges that he is 53 years of age and is qualified to perform his job. There is <u>nothing</u> in the First Amended Complaint to implicate age as a factor in Plaintiff's termination.

(60)   In fact, the Company is proud of its unblemished history as an equal opportunity employer. No charges or lawsuits alleging age discrimination have ever been filed against the Company.

(61)   At Crestwood alone, out of a total of thirty (30) workers, the Company employs eleven (11) employees, including myself, over the age of 50:

(a)   Jeffrey Burdick       56

(b)   Noel Alvarez          61

(c)   Marina Carter         53

(d)   Pablo Corporan        54

(e)   Pedro Desiderio       57

(f)   Augusto Fortes        66

(g)   David Galvez Santos   58

(h)   Justo Guity           59

(i)   Bruce Onufrey         51

  (j)  Genc Tinaj  54

  (k)  Gustavo Narvaez  55

(62) Conversely, the Company has terminated employees for violations of its rules, standards and procedures without regard to age. For example, Woodner terminated Edgar Cruz, age 36, who was, in fact, outside of the age-protected class.

(63) Prior to the initiation of this lawsuit, Plaintiff never complained to the Company, the Union, the Equal Employment Opportunity Commission (EEOC) or the New York State Division of Human Rights (NYSDHR) that he was the victim of age discrimination.

(64) For the reasons set forth above, I am informed by counsel that Plaintiff's claim that he suffered age discrimination in violation of the New York State Human Rights Law is deficient as a matter of law and must be dismissed.

  C. <u>Age Discrimination in Violation of the Federal Age Discrimination in Employment Act</u>

(65) Plaintiff alleges that he was denied promotion and terminated "due to his age" in violation of the Age Discrimination in Employment Act (ADEA).

(66) I respectfully repeat, re-assert and re-allege all of the facts that I recited in opposition to the Plaintiff's claim of age discrimination under the New York State Human Rights Law.

(67) In addition, I am informed by counsel that a civil action may not be filed until sixty (60) days after a charge is filed with the EEOC or the NYSDHR.

(68) No such charges have been filed by Plaintiff in this matter.

(69) I am further informed by counsel that individuals acting in their official capacities, such as myself, are not liable under the ADEA.

(70) For the reasons set forth above, I am informed by counsel that Plaintiff's claim that he suffered age discrimination in violation of the ADEA is fatally deficient as a matter of law and must be dismissed.

### D. Breach of the Collective Bargaining Agreement

(71) Plaintiff alleges that Defendants breached the collective bargaining agreement between Woodner and Local 32BJ by terminating his employment without "good and just cause" (DOC. NO. 11, ¶¶ 41-43) and by ordering him to remove his personal belongings from a company-provided storage unit (DOC. NO. 11, ¶ 44).

(72) Plaintiff has failed to exhaust the contractually-mandated grievance and arbitration contained in the CBA. A true and accurate copy of the pertinent section of the CBA is annexed hereto and made part hereof as Exhibit "A."

(73) Similarly, Plaintiff has failed to provide any reason for his failure to exhaust the contractually-mandated grievance and arbitration contained in the CBA, such as the Union's violation of its legal duty of fair representation.

(74) I am informed by counsel that, absent such allegations, an individual union member has no standing to enforce a collective bargaining agreement between his union and his employer.

(75) I note in passing that I am not a signatory to the CBA in my personal capacity.

(76) For the reasons set forth above, I am informed by counsel that Plaintiff's claim that the CBA has been violated is deficient as a matter of law and must be dismissed.

### CONCLUSION

(77) This is simply a case of a long-term employee who cannot accept that he was terminated for poor job performance. Instead, he uses this lawsuit to lash out against his former employer on the most conclusory and least supported of grounds. His case is all vitriol but no facts.

(78) No previous application has been made for the relief requested herein.

Dated: Yonkers, New York
January 19, 2018

_____
JEFFREY BURDICK

Sworn to before me this
19th day of January, 2018

_____
(NOTARY PUBLIC)

CARMEN MORENO
NOTARY PUBLIC, State of New York
No. 01MO6189556
Qualified in Rockland County
Commission Expires June 30, 2020

# Exhibit "A"

shall not exceed three (3) separate occasions during the course of the employee's employment.

SIXTH

ARBITRATION, DISCIPLINE, DISCHARGE, & EVICTION

A.  Arbitration

1.  Any dispute, controversy or grievance arising under the Agreement between the parties or between any Employer or Employer-member of the Association and the Union or any of its members shall first be submitted in writing by the party claiming to be aggrieved to the other within 30 days for discharges or suspensions and 120 days for other grievances except for fund delinquencies.  Fund delinquencies must be brought within 6 years of their occurrence.

   a.  Step 1 - Within ten (10) days of notice of the grievance the business representative of the Union and the Employer, or its representative, shall meet to discuss a resolution of the grievance. If no agreement is reached at this step, the parties may simultaneously proceed to step 2 and step 3.

   b.  Step 2 - The parties shall make their best efforts to schedule meetings on the first Tuesday of each month between representatives of the BRI and the Union, for the purpose of discussing resolutions of grievances that have not been resolved at step 1.  Nothing herein shall preclude either party from submitting a grievance that has not been resolved at step 1 to arbitration under step 3.

   c.  Step 3 - Either party may within thirty (30) days of step 1 submit the grievance to a contract arbitrator who shall be appointed from a rotating panel of arbitrators agreed to by the Union and the BRI.  For grievances challenging the discharge of an employee that are not resolved at Step 1, the Union must file for arbitration within 15 days of the conclusion of the Step 1 meeting.  The Arbitrators shall be Amy Itzla, Ron Betso and Martin Ellenberg.  The Union shall, to the extent practicable, provide an expeditious process for administering arbitrations, including for rotation of appointments among the panel of arbitrators, and shall provide quarterly information on said rotation to the BRI.  When scheduling arbitration hearings on grievances challenging the discharge of any resident employees, including superintendants, the parties shall make their best efforts to ensure that their representatives and witnesses for the hearing will be available within 30 days of attempting to schedule the hearing.  Additionally, in such cases, the parties agree that if the arbitrator selected by rotation is not available within 30 days of attempting to schedule the hearing, the parties shall select another arbitrator from the panel who is available within such 30-day period, or in the absence of such availability, at the next earliest available date.

     The arbitrator shall be empowered to hear the dispute and make a final decision therein, binding upon the parties, in accordance with the laws of New York State. Successor or additional arbitrators shall be appointed by mutual agreement of the Union and the BRI. In the event of the removal, death or resignation of an arbitrator, a successor or temporary substitute shall be chosen by the Union and the BRI.

     2.   Failure to follow these time limits shall be deemed a waiver of the grievance.

     3.   No more than one adjournment per party shall be granted by the arbitrator without consent of the opposing party. In the event of a default by any of the parties hereto in appearing before the designated arbitrator, after written notice, the arbitrator is hereby authorized to render a decision upon the testimony of the party appearing. The parties waive the provision of Section 7506(a) of the Civil Practice Law and Rules. The Employer or the Union shall bear any expense caused by its nonappearance at one or more scheduled arbitration hearings, as long as sufficient and adequate notice has been served on them.

     4.   Subdivision (d) of Paragraph Fourth is a part hereof as if fully set forth herein.

     5.   An employee shall not be penalized or discriminated against for attending, when required, arbitrations, hearings or other matters pursuant to the Union constitution. Any grievant attending grievance meetings or arbitrations shall be paid their regularly scheduled hours during such attendance. When such need for the employee's attendance ends, the employee shall return to complete his/her regularly scheduled work day.

     B.   <u>Discipline, Discharge & Eviction</u>

     1.   No employee who has completed his trial period shall be discharged, dispossessed or evicted without good and just cause, and then only in compliance with this paragraph.

     2.   In the event of a discharge, the Employer shall give notice in writing in accordance with his expressed intent that the services of an employee are not desirable setting forth the reasons.

     3.   The Employer waives its rights under Section 713 of the Real Property Actions and Proceedings Law of New York insofar as it shall apply to Superintendents, Janitors or other persons occupying or possessing premises as part of their compensation or remuneration for or incidental to their employment until the issue of good and just cause has been decided. The Employer shall not remove from the premises any of the personal belongings of the said employee, until the issue of good and just cause has been determined by arbitration as herein provided. This provision, however, may be waived by the Union.

9